UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JEFFERY DeANGELIS, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO. 3:16-cv-307 (MPS) |
| | : | |
| MONICA FARINELLA, et al., | : | |
| Defendants. | : | |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The plaintiff, Jeffery DeAngelis, commenced this civil rights action against correctional officials

and medical staff at several correctional facilities. He contends that the defendants were deliberately

indifferent to his serious medical needs. The defendants move for summary judgment. For the reasons

that follow, the defendants' motion is GRANTED in part and DENIED in part.

I.     Standard of Review

A motion for summary judgment may be granted only where there is no genuine dispute as to

any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(a), Fed. R.

Civ. P.; *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009). The moving party may satisfy his burden

"by showing—that is pointing out to the district court—that there is an absence of evidence to support

the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per

curiam) (internal quotation marks and citations omitted). Once the moving party meets this burden, the

nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v.

Goord*, 554 F.3d 255, 266 (2d Cir. 2009). He must present such evidence as would allow a jury to find

in his favor to defeat the motion for summary judgment. *Graham v. Long Island R.R.*, 230 F.3d 34, 38

(2d Cir. 2000). The nonmoving party "must offer some hard evidence showing that its version is not

wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

II.    Facts[1]

    A.    Medical Treatment at Corrigan-Radgowski Correctional Center (2010-2012)

    The plaintiff was admitted to the custody of the Connecticut Department of Correction in January 2010. On September 1, 2010, at Corrigan-Radgowski Correctional Center, Defendant Dr. Monica Farinella examined the plaintiff in response to claims of a herniated disc. She had him perform various movements to assess his strength, ability to flex, and muscle atrophy. According to her assessment, the plaintiff was able to function well. He had no neurological deficits or loss of strength. The medical notes refer to a June 2001 MRI which showed a mild disc bulge or small subligamentous central herniation[2] which did not significantly affect the dural sac, nerve roots, or neural foramina. Dr. Farinella found no need for a repeat MRI, but ordered an x-ray of the plaintiff's spine. The x-ray showed no fractures and normal vertebral alignment. The disc spaces were preserved and the paravertebral soft tissue was unremarkable. The x-ray did show a minimal posterior osteophyte formation, or bone spur. Dr. Farinella renewed the plaintiff's prescription for Naprosyn, to be taken twice a day, and instructed the plaintiff to perform back exercises.

    Dr. Farinella saw the plaintiff again on October 18, 2010. The plaintiff requested surgery because the bulging disc caused severe intermittent pain down his left leg. Dr. Farinella told the plaintiff that he was not a surgical candidate. He was able to ambulate without difficulty, had good strength, and showed no neurological deficits. Dr. Farinella reviewed the plaintiff's medical records

---

[1] The facts are taken from the parties' Local Rule 56(a) Statements and attached exhibits.

[2] Although the plaintiff states that he did not sign a release for these records until 2012, he offers no explanation of how Dr. Farinella would be able to include a reference to the MRI results in her September 2010 notes without reviewing the records.

including the recent x-ray results. She told him to continue the back exercises and the Naprosyn.

In January 2011, per the plaintiff's request, Dr. Farinella renewed the Naprosyn prescription for three months. In February 2011, however, the plaintiff complained to medical staff that the Naprosyn was not providing relief. His chart was referred to Dr. Farinella. In March 2011, Dr. Farinella discontinued the Naprosyn and prescribed Motrin for pain relief. Dr. Farinella again saw the plaintiff in June 2011. Medical notes indicate that the plaintiff reported that the Motrin had relieved his sciatica pain. Dr. Farinella renewed the Motrin prescription for six months. The plaintiff now states that he received no pain relief from any prescribed medication.

On September 2, 2011, the plaintiff attended sick call complaining of upper back and neck pain. He was placed on the list to see Dr. Farinella. The plaintiff saw the doctor on September 8, 2011, and requested a special air mattress. After examining the plaintiff, Dr. Farinella concluded that there was no need for a special air mattress.

The plaintiff again complained of back pain to medical staff on September 24, 2011. Staff noted that the plaintiff was ambulating without difficulty, climbing up and down stairs without difficulty, standing with full weight bearing, and walking with a steady gait. He was referred to Dr. Farinella. On September 27, 2011, Dr. Farinella renewed the plaintiff's Motrin prescription for six months.

On January 3, 2012, the plaintiff attended sick call to request a renewal of his Motrin prescription. As the plaintiff was no longer indigent, he was instructed to purchase Motrin at the commissary. On January 17, 2012, the plaintiff returned to sick call complaining that Motrin was not effective and was hurting his stomach. He requested a prescription for Naprosyn. On January 26, 2012, Dr. Farinella noted the plaintiff's complaints and told him to purchase Ibuprofen and Tylenol at the commissary.

On February 5, 2012, and March 14, 2012, the plaintiff complained to medical staff that Motrin was causing stomach pain. He stated that he wanted Naprosyn but agreed to a trial of Tylenol given pursuant to a nursing protocol. On April 27, 2012, Dr. Farinella prescribed Naprosyn for six months. She also prescribed other medications for issues unrelated to this action.

On May 4, 2012, Dr. Farinella examined the plaintiff for his complaints of back pain. Medical notes indicate that he wanted her to order an MRI for use in a state habeas case. Dr. Farinella noted that the plaintiff was not in acute distress and ambulated without difficulty. She observed that the plaintiff was able to transfer from sitting, supine, and standing positions without difficulty. Dr. Farinella observed no signs of functional or neurological deficits and concluded that an MRI was not medically warranted. She did order another x-ray of the lumbar spine.

The x-ray showed no evidence of fracture or spondylolisthesis. There was normal vertebral body alignment. The vertebral body heights and intervertebral disc spaces were normally maintained. The posterior elements and both S1 joints were unremarkable. In short, the x-ray showed no abnormality.

B.    Medical Treatment at Cheshire Correctional Institution

On May 30, 2012, the plaintiff was transferred to Cheshire Correctional Institution, where he remained until April 8, 2013. The plaintiff was seen in the medical department on July 13, 2012 for complaints of back pain. He reported mild pain and stated that his pain medication was not helping much. The plaintiff was instructed on stretching exercises.

On October 23, 2012, the plaintiff saw a registered nurse for complaints of back pain. He requested an egg crate mattress, Naproxen, and a bottom bunk pass. The following day, Dr. Ruiz prescribed Naprosyn, a brand of Naproxen, for six months. Naprosyn is an anti-inflammatory medication used to treat pain and inflammation.

Dr. Ruiz examined the plaintiff on October 29, 2012. The plaintiff told Dr. Ruiz that he had a herniated disc at L5-S1 and sciatica on the left side from his back to his ankle. Dr. Ruiz noted that plaintiff was able to sit, stand, and walk normally and exhibited no evidence of muscle atrophy. He scored 4-5 out of 5 on tests for motor strength on extension/flexion of his ankle. Any limitation was the result of pain, not weakness. Dr. Ruiz opined that the plaintiff was not making a good effort during the tests. He also questioned the plaintiff's statements that he had a herniated disc at L5-S1 but sciatica from the nerve roots at L3-L4. Dr. Ruiz also stated that he reviewed an MRI of the plaintiff's back from 2009. Dr. Ruiz prescribed Elavil, an anti-depressant also used to treat pain, for 90 days, ordered a bottom-bunk pass for 90 days, and directed the plaintiff to return for a follow-up examination in 90 days. Dr. Ruiz attempted to teach the plaintiff stretching exercises but the plaintiff refused, stating that stretching made his back worse.

On November 6, 2012, Dr. Ruiz discontinued Elavil at the plaintiff's request. He wanted to substitute Neurontin. Because Neurontin is a nonformulary medication, meaning that it had to be approved and specially ordered for the plaintiff, Dr. Ruiz had to seek permission to prescribe it. The request for Neurontin was approved and, on November 29, 2012, Dr. Ruiz prescribed Neurontin for one year. On February 15, 2013, Dr. Ruiz renewed the bottom bunk pass for one year.

C.     Medical Treatment at Garner Correctional Institution

On April 8, 2013, the plaintiff was transferred to Garner Correctional Institution. In August 2013, he underwent an MRI of the lumbar spine. The MRI showed normal alignment of the lumbar vertebrae. There was a mild circumferential disc bulge without significant stenosis at L1-L2. There was no significant disc bulge or stenosis at L2-L3 or L3-L4. There was, however, some early mild degeneration or arthritis at L3-L4. Although L4-L5 showed mild circumferential disc bulge and facet

arthropathy as well as mild foraminal narrowing, there was no significant canal stenosis. At L5-S1, the MRI showed degenerative disc disease with a left disc protrusion which was adjacent to and slightly displacing the left S1 nerve root within the lateral recess.

### D.    Medical Treatment at Corrigan-Radgowski Correctional Center (2015-2016)

The plaintiff returned to Corrigan-Radgowski Correctional Center ("Corrigan") on May 29, 2015. On June 1, 2015, he was examined by an APRN for complaints of lower back pain and leg pain. The APRN noted that the plaintiff's gait was steady and he had no restrictions on raising and lowering his legs. His reflexes appeared normal. The plaintiff told the APRN that he performed sit-ups and push-ups every day. The APRN renewed the plaintiff's prescription for NSAIDS/Lyrica.

On August 12, 2015, the plaintiff was seen at sick call complaining of lower back pain. Dr. Figura reviewed his chart and examined the plaintiff the same day. The plaintiff told Dr. Figura that he had foot drop and lower back pain. Dr. Figura's physical examination of the plaintiff showed moderate weakness in plantar flexion and iliopsoas on the affected side, but no evidence of foot drop. She opined that, if the plaintiff had foot drop, he would have been unable to perform the movements he did perform.[3]

On August 19, 2015, Dr. Figura requested an MRI of the plaintiff's spine. The request was in response to the plaintiff's complaint of L5-S1 radicular pain and foot drop that had interfered with his activities of daily living since 2013. Since 2013, the plaintiff had three epidural steroid injections, the last in 2014. He stated that the injections provided no relief.

On September 8, 2015, the plaintiff refused his appointment for an MRI at the University of

---

[3] The plaintiff contends that Dr. Figura included foot drop in his diagnosis. An examination of the medical note shows, however, that she noted foot drop when recounting the plaintiff's complaints, not in her diagnosis. Defs.'s Mem. Ex. A at 899, ECF No. 38 at 53.

Connecticut Health Center ("Health Center"). The defendants state that the plaintiff refused the appointment because he already had had an MRI. The plaintiff states that he refused the appointment because he would be required to pack and carry his property, and travel to New Haven Correctional Center to stay for the duration of his treatment. He also states that he would not be permitted to take his prescribed medication for sciatica and nerve pain while at New Haven Correctional Center.

On September 25, 2015, the plaintiff told Dr. Figura that he would agree to the MRI only if he was directly transported to the Health Center. She expressed agreement with the plaintiff's objections to Correctional Transportation Unit ("CTU") transport, which would route him through the New Haven Correctional Center, and noted her intent to seek Utilization Review Committee approval for a direct trip. Dr. Figura also noted an impression of left foot drop.

Upon examination of the plaintiff in September 2015, Dr. Figura noted that he scored 3+ out of 5 on the plantar flexion test. The plaintiff was able to perform a downward movement of his left foot in which his foot or toes flex downward toward the sole of his foot with a fair number of repetitions. She also noted that the plaintiff scored a 3+ out of 5 on the iliopsoas flexion test of his left thigh. The iliopsoas muscle is one of the major hip flexors. The plaintiff was able to perform the exercise of this muscle with a fair number of repetitions. The plaintiff also complained of neuropathic pain and weakness in the fingers of his right hand and decreasing strength. The plaintiff attributed this condition to being handcuffed. Dr. Figura's examination of the plaintiff's hand was consistent with ulnar nerve compression. As a result, Dr. Figura submitted a request to the Utilization Review Committee to have a nerve conduction study performed on the plaintiff.

On October 1, 2015, the plaintiff stated that he would speak to his counselor about a transfer to a correctional facility that provided direct transportation to the Health Center. Dr. Figura learned that

same day that the plaintiff was denied a transfer because of profiles.  The plaintiff refused to go to his appointment at the Health Center because he claimed to be unable to carry his property.

Also on October 1, 2015, the plaintiff requested a double mattress.  Dr. Figura told the plaintiff that she could not order a double mattress because Captain Shabenas had told her that double mattresses are not permitted.

On October 5, 2015, the Utilization Review Committee approved the request for a nerve conduction study for the plaintiff's wrist.  On November 4, 2015, the plaintiff again refused his appointment for an MRI claiming he was unable to pick up his property and carry it down two flights of stairs.

On March 16, 2016, Dr. Figura examined the plaintiff at sick call.  The plaintiff complained of foot drop.  He denied all other extremity weakness and did not complain of pain.  Dr. Figura reviewed the plaintiff's medical records.  Dr. Figura noted discrepancies between her examination and the plaintiff's complaints.  Her impression was that he did not have clinically proven MRI evidence of radicular disease or foot drop.  Although she did not think the results would be different from the MRI in 2013, Dr. Figura sought approval for an MRI.  She also ordered that the plaintiff be permitted to come to the medical unit three time a week to soak his left foot.

On April 4, 2016, Dr. Figura again examined the plaintiff at sick call.  Medical notes indicate that the plaintiff was able to hold his foot and had normal, well-developed musculature.  These findings are not consistent with the plaintiff's claim of foot drop.

On April 11, 2016, the Utilization Review Committee approved the MRI.  On April 20, 2016, the plaintiff refused the MRI appointment.  He claimed that he refused the appointment because custody staff was supposed to carry his property for him and they refused.

On May 4, 2016, Dr. Figura examined the plaintiff at sick call. Her notes indicate that he was able to hold his foot straight. Dr. Figura noted that this was inconsistent with foot drop and saw no clinical evidence suggesting that the plaintiff suffered from foot drop.

While confined at Corrigan, the plaintiff has been prescribed several medications for pain including Motrin, Naprosyn, and Lyrica.

The plaintiff underwent an MRI of his lumbar spine on July 26, 2016, which showed normal vertebral body heights and alignment and normal bone marrow signal. The test showed no disc herniation, spinal canal or neural foraminal stenosis at L1-L2, L2-L3, or L3-L4. The MRI showed a mild broad-based disc bulge and facet arthropathy without significant spinal canal stenosis or neural foraminal narrowing at L4-L5, and a size stable left paracentral disc protrusion at L5-S1 with no spinal canal stenosis. The disc protrusion and facet arthropathy produce mild bilateral neural foraminal narrowing, greater on the left than the right. The disc protrusion abuts, but does not displace, the axillary sleeve of the existing L5 nerve root. A comparison of the findings on the 2013 and 2016 MRI's shows no interval change in the small L5-S1 disc protrusion and facet arthropathy.

The plaintiff also underwent electroneurmyography ("EMG") studies on August 12, 2016. An EMG study measures the electrical impulses of muscles when they are at rest and being used. Nerve conduction studies measure how well and how fast the nerves send electrical signals. The test is used to determine which nerves are causing back or leg main or numbness. An EMG study is useful in diagnosing foot drop as it is a peroneal nerve injury. The plaintiff's EMG study was normal. It showed no explanation for the plaintiff's complaints of dorsiflexion weakness.

E.    Department of Correction Policies

The Department of Correction used to allow inmates to have double mattresses if ordered by

medical staff.  A double mattress is simply two mattresses placed one on top of the other.  However, in 2015, the Department of Correction identified this as a safety and security concern and instituted a policy prohibiting double mattresses. (The plaintiff avers that double mattresses were allowed at two facilities, but he was not housed at those facilities when he was denied the double mattress at Corrigan and provides no facts suggesting a basis for personal knowledge of the practices at those other two facilities at that time.)  In the fall of 2015, Captain Shabenas explained the change in policy to Dr. Figura.

Transportation of Connecticut inmates is handled by the CTU.  This includes transporting inmates from all correctional facilities to medical appointments.  A facility transport is made by correctional officers at a particular correctional facility using a vehicle designed for transporting inmates that is assigned to that facility.

Most inmate medical appointments that are not conducted at the facility are at the Health Center in Farmington, Connecticut.  Inmates at Corrigan are not transported directly to the Health Center.  Instead, they are transported from Corrigan to the New Haven Correctional Center ("New Haven") and, from there, are taken to the Health Center.  When the appointment is concluded, the inmate is transported back to New Haven.  Depending on several factors, including the time of day the inmate returns to New Haven, the number of inmates needing transportation and other administrative needs of the Department of Correction, the inmate is returned to Corrigan as soon as practical.  The inmate may be returned the same day, the following day, or later.  Prior to leaving Corrigan for the appointment, the inmate packs his property and brings it with him to New Haven.

An inmate can be transported to the Health Center by facility transport if medical staff deem it medically necessary.  The plaintiff wanted to be taken to the Health Center by facility transport.

Defendant Warden Santiago states that he learned from medical staff at Corrigan that there was no medical need for facility transport. The plaintiff submitted a medical record noting that the practice of requiring him to carry his property and sleep on the floor at New Haven and denying Lyrica while he was at New Haven was contraindicated. The note does not, however, order facility transport. Warden Santiago decided there was no legitimate reason to make an exception to the transport policy. In response to the plaintiff's claim that he was unable to pack and carry his property from his cell to the transport vehicle, Warden Santiago instructed staff to have an inmate available to assist the plaintiff in packing and carrying his property. The defendants state that the plaintiff refused the assistance of another inmate because he wanted staff to pack and carry his property for him. The plaintiff states that Captain Shabenas refused to permit anyone to carry the plaintiff's property, and that no inmate assistance was offered.

III.    Discussion

The plaintiff includes nineteen counts in his complaint: (1) defendant Farinella violated the plaintiff's Eighth Amendment rights by not performing necessary tests and refusing to treat him or send him to a specialist; (2) defendant Farinella was deliberately indifferent to the plaintiff's serious medical needs; (3) defendant Farinella delayed the plaintiff's medical treatment by disregarding his requests for treatment and testing; (4) defendant Ruiz violated the plaintiff's Eighth Amendment rights by treating the plaintiff as a nuisance and failing to refer him to a specialist; (5) defendant Ruiz was deliberately indifferent to the plaintiff's serious medical needs by failing to respond to complaints of chronic and debilitating pain and ordering stretching exercises that are detrimental to anyone with disc injuries; (6) defendant Ruiz delayed the plaintiff's medical treatment by disregarding repeated requests for treatment and testing; (7) defendant Figura violated the plaintiff's Eighth Amendment rights by refusing to order a

double mattress and ordering another MRI rather than a consultation with a specialist; (8) defendant Figura was deliberately indifferent to the plaintiff's medical needs when she was aware that he would be required to pack and carry his property to attend medical appointments but failed to order him transferred to another correctional facility; (9) defendant Figura delayed the plaintiff's medical treatment by ordering an MRI when she knew that the plaintiff would be required to pack and carry his property to attend the appointment and knew that he had a previous MRI and that his condition could be resolved only by surgery; (10) defendant Augusto violated the plaintiff's Eighth Amendment rights by ignoring his grievances; (11) defendant Augusto refused to investigate or respond to the plaintiff's grievances; (12) defendant Semple created policies and procedures creating housing and transportation issues that override medical needs; (13) defendant Semple violated the plaintiff's Eighth Amendment rights by making Corrigan the only level 4 correctional facility without direct daily transport to the Health Center; (14) defendant Shabenas was deliberately indifferent to the plaintiff's serious medical needs by telling Dr. Figura that a double mattress was not permitted and "denying him to go to his medical appointments"; (15) defendant Augusto was deliberately indifferent to the plaintiff's serious medical needs by denying him transfer to Garner Correctional Institution or Cheshire Correctional Institution when the plaintiff does not have a profile preventing such transfers; (16) defendant Santiago was deliberately indifferent to the plaintiff's serious medical needs by denying access to medical care for financial reasons; (17) defendant Santiago's actions in requiring the plaintiff to pack and carry his property violates the Eighth Amendment, (18) defendant Santiago delayed the plaintiff's medical treatment by denying facility transport, and (19) defendant Santiago failed to protect the plaintiff when he failed to implement procedures that would enable the plaintiff to obtain medical care without having to pack and carry his property. The plaintiff seeks injunctive relief in the form of a transfer to any other

correctional facility, a double mattress and orders preventing all defendants from retaliating against him, as well as declaratory relief and damages.

The defendants move for summary judgment on six grounds: (1) the Eleventh Amendment bars any award of damages against the defendants in their official capacities; (2) the defendants are protected by qualified immunity; (3) the defendants did not violate the plaintiff's Eighth Amendment rights; (4) the defendants did not prevent the plaintiff from participating in the Administrative Remedy Process; (5) any claims against defendant Semple as a policymaker must be dismissed; and (6) the defendants are entitled to judgment as a matter of law on any supplemental state law claims.

As an initial matter, the Court notes that the plaintiff states in his declaration that the defendants did not provide him "a complete and accurate copy" of his medical records in discovery, thereby impeding his ability to respond to the motion for summary judgment. ECF No. 46-14 at 17, ¶ 52. The plaintiff subsequently filed two motions to compel discovery responses. ECF Nos. 34, 35. Because these motions were not compliant with Fed. R. Civ. P. 37 or Local Rule 37, the Court denied these motions with prejudice. The plaintiff refiled the motions to compel. ECF No. 51. The defendants objected, stating that they had already provided the plaintiff with all of the asked-for discovery several months earlier. ECF No. 54. The plaintiff confirmed that he had received this discovery. ECF Nos. 55, 56. There was a remaining matter of transcriptions of some handwriting on the plaintiff's medical records, but the plaintiff received these transcriptions as well in June 2017. The Court then allowed the plaintiff to file a supplemental response to the summary judgment motion, ECF No. 56, which he did on October 10, 2017. ECF No. 65. However, the supplemental memorandum does not identify any new evidence that would change the Court's analysis, compared with his initial opposition memorandum. *Id.*[4]

---

[4] To the extent the plaintiff seeks to add an equal protection claim—stating that another inmate was

A.      Eleventh Amendment

The plaintiff names defendants Santiago and Semple in both individual and official capacities. The defendants argue that the Eleventh Amendment bars any claims for damages against defendants Santiago and Semple in their official capacities. In opposition to the motion for summary judgment, the plaintiff states that he seeks only declaratory and injunctive relief against these two defendants in their official capacities. This distinction is not included in the complaint.

The Eleventh Amendment divests the district court of subject matter jurisdiction over claims for money damages against state officials acting in their official capacities unless the state has waived that immunity or Congress has abrogated it. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). Section 1983 does not abrogate state sovereign immunity, *see Quern v. Jordan*, 440 U.S. 332, 343 (1979), and the plaintiff provides no evidence of waiver. Accordingly, the defendants' motion for summary judgment is granted as to any claims for damages against defendants Santiago and Semple in their official capacities.

B.      Eighth Amendment Medical Claims

The plaintiff asserts claims for violation of his rights under the Eighth Amendment against all of the defendants. These claims allege cruel and unusual punishment, deliberate indifference, and delay of treatment.

The Eighth Amendment protects against cruel and unusual punishment. A prisoner stating an Eighth Amendment claim must allege facts demonstrating that prison officials failed to provide for his "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989); *see also Rhodes v. Chapman*, 452 U.S. 337,

_____

provided an extra mattress while he was not—he cannot now do so, after failing to include one in his

347 (1981) (only those conditions depriving inmates of the "minimal civilized measure of life's necessities" are sufficiently serious to form the basis of an Eighth Amendment claim).

"The Eighth Amendment forbids deliberate indifference to serious medical needs of prisoners." *Spavone v. N.Y. State Dep't of Corr. Servs.,* 719 F.3d 127, 138 (2d Cir. 2013) (internal quotation marks omitted). To establish a claim for deliberate indifference to a serious medical need, the plaintiff must allege facts demonstrating two elements. The first element is objective: "the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone*, 719 F.3d at 138 (internal quotation marks omitted). Under this objective element, a court must determine first, "whether the prisoner was actually deprived of adequate medical care," and second, "whether the inadequacy in medical care is sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006). Adequate medical care is reasonable care such that "prison officials who act reasonably cannot be found liable." *Farmer,* 511 U.S. at 845. The plaintiff also must allege facts showing that his medical needs, "either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition*." Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has presented "a non-exhaustive list" of factors to consider: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). The defendants do not argue that the plaintiff's medical need is not serious.

In considering deliberate indifference claims, courts distinguish between situations where no

---

complaint and after the motion for summary judgment has been fully briefed for months.

medical attention is given and situations where medical attention is given, but is objectively inadequate. In the former, the court need only "examine whether the inmate's medical condition is sufficiently serious." *Salahuddin,* 467 F.3d at 280. In the latter, however, the inquiry is "narrower"; for example, "if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" *Id.* (quoting *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003)).

The second element is subjective; the defendant "must be subjectively reckless in [his] denial of medical care." *Spavone*, 719 F.3d at 138. The inquiry is whether the defendant "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm*." Lewis v. Swicki*, 629 F. App'x 77, 79 (2d Cir. 2015) (quoting *Farmer*, 511 U.S. at 837-38) (internal quotation marks omitted). The defendants must have acted or failed to act "while actually aware of a substantial risk that serious inmate harm will result." *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (internal quotation marks omitted). In contrast, "mere medical malpractice is not tantamount to deliberate indifference," unless "the malpractice involves culpable recklessness, i.e., a conscious disregard of a substantial risk of serious harm." *Chance*, 143 F.3d at 703 (internal quotation marks and citation omitted). Further, "mere disagreement over the proper treatment does not create a constitutional claim," and "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.*

      1.   <u>Dr. Farinella</u>

Dr. Farinella treated the plaintiff during his first confinement at Corrigan, from 2010 through May 2012. The medical records show that she examined the plaintiff many times. She reviewed his

medical records, including prior MRI results, and ordered x-rays, which showed no abnormalities. She prescribed medication for pain and ordered exercises. The plaintiff requested a special mattress and surgery. Upon examination, however, Dr. Farinella found that the plaintiff could walk without difficulty and with a steady gait, climb stairs without difficulty, bear weight on his legs, and easily change position. He displayed no functional or neurological deficits. Thus, in her opinion, an MRI, a special mattress, and surgery were not warranted.

In opposition to the motion for summary judgment, the plaintiff presents no evidence showing that additional treatment or referral to a specialist was required. He merely argues that, because Dr. Valletta ordered an MRI a year after Dr. Farinella stopped treating him, that her treatment was insufficient. That two doctors disagreed over treatment does not state a cognizable section 1983 claim.

Further, even if this treatment were required, the plaintiff does not present evidence showing that Dr. Farinella perceived and disregarded a substantial risk that the plaintiff would suffer serious harm by her failure to order an MRI. Thus, the plaintiff has not presented evidence to support the subjective component of the deliberate indifference standard. The claim against Dr. Farinella is, at most, a disagreement about treatment, which is not cognizable under section 1983.[5] Accordingly, the defendants' motion for summary judgment is granted as to the claims against Dr. Farinella, included in counts 1-3 of the complaint.

2.    Dr. Ruiz

---

[5] The Court notes that Dr. Farinella provided medical treatment only from 2010 through May 2012. The plaintiff filed this action in February 2016. The limitations period for filing a section 1983 action in Connecticut is three years. *See Lounsbury v. Jeffries*, 25 F.3d 131, 134 (2d Cir. 1994). Dr. Farinella was not involved in the plaintiff's treatment for over three years prior to the filing of the complaint. Thus, any claims against her also are time-barred.

Dr. Ruiz treated the plaintiff for approximately one year. The plaintiff alleges that Dr. Ruiz treated him as a nuisance, failed to refer him to a specialist, failed to respond to his complaints of chronic, debilitating pain, and ignored his requests for treatment and testing. The record shows that Dr. Ruiz examined the plaintiff on several occasions. He prescribed pain medication and issued a bottom bunk pass. He prescribed stretching exercises, which he has found to be effective in treating back pain, but the plaintiff refused to try them. The two prior MRI's showed a mild disc bulge. Dr. Ruiz's examination and observations of the plaintiff showed that the plaintiff was able to sit, stand, and walk normally and that he displayed no signs of muscle atrophy. Although the plaintiff showed some limitations on extension and flexion of his ankle, Dr. Ruiz attributed the limitations to lack of effort on the plaintiff's part and limitations caused by pain rather than weakness. These observations led him to conclude that the plaintiff's pain could be managed with medication and exercise and that a new MRI and consultation with a specialist were not required.

Although the plaintiff disagrees with the treatment he was provided, he has provided no evidence showing that an MRI or consultation with a specialist was required during the time Dr. Ruiz was treating him, or that Dr. Ruiz understood that there was a substantial risk that the plaintiff would suffer serious harm by his failure to order an MRI or consultative examination and disregarded that risk. Although Dr. Ruiz noted that the plaintiff's description of the location of his back issues did not match the prior MRI results, the fact that he did not order a new MRI to try to resolve this issue is at most negligence, which is not cognizable under section 1983. The defendants' motion for summary judgment is granted as to the claims against Dr. Ruiz which are contained in counts 4-6 of the complaint.

      3. <u>Dr. Figura</u>

The plaintiff contends that Dr. Figura violated his Eighth Amendment rights by refusing to order him a double mattress or consultation with a surgical specialist and in persisting in ordering MRI's when she knew that he was unable to pack and carry his property to go to the appointment. He also faults Dr. Figura for not transferring him to another facility where he could obtain direct transport to the Health Center.

Dr. Figura decided to order another MRI before referring the plaintiff to a specialist. This is a treatment decision. The fact that the plaintiff disagrees does not rise to the level of a cognizable section 1983 claim. Dr. Figura also considered, but did not order, a double mattress. The plaintiff has presented no evidence showing that a double mattress was medically required as opposed to preferred. Absent such a showing, Dr. Figura's decision not to prescribe one is a disagreement over treatment.

The issue with transportation to the medical appointments, however, is different. The plaintiff has submitted Dr. Figura's note from his medical file that she agreed with the plaintiff's argument that requiring him to sleep on the floor at New Haven, possibly for several days, denying him prescription medication while at New Haven, and requiring the plaintiff to carry his property for the transport was counterproductive. She noted that she would request a facility transport from the Utilization Review Committee. *See* Pl.'s Mem. Ex. A at 6, ECF No. 46-3 at 7. The record contains evidence that Dr. Figura submitted several requests to the Utilization Review Committee seeking various tests for the plaintiff. Despite her acknowledgment that CTU transport was contraindicated and statement that she would try to obtain permission for direct transport, the record contains no evidence that Dr. Figura did so. Nor does Dr. Figura acknowledge this issue in her affidavit. The Court concludes that there is an issue of fact regarding whether Dr. Figura understood that failing to attempt to get permission for direct transport subjected the plaintiff to a substantial risk of serious harm. Accordingly, this claim will

proceed against defendant Figura.  The defendants' motion for summary judgment is granted as to the claim against Dr. Figura in count 7 of the complaint and denied with respect to the claims in counts 8 and 9.

C.      Eighth Amendment Conditions Claims

The plaintiff also asserts claims under the Eighth Amendment against Captain Shabenas, Warden Santiago, and Commissioner Semple.  The plaintiff contends that Captain Shabenas violated his Eighth Amendment rights by telling Dr. Figura that double mattresses were not allowed and refusing to provide assistance with his property to enable him to attend medical appointments.  The plaintiff alleges that Warden Santiago violated his rights by denying facility transport for financial reasons and requiring him to pack and carry his property. Finally, the plaintiff argues that Commissioner Semple is responsible for creating the policy denying direct transport to the Health Center for inmates at Corrigan.

1.      Double Mattresses

The plaintiff contends that Captain Shabenas was deliberately indifferent to his serious medical need or subjected him to unconstitutional conditions of confinement by denying a double mattress.  Dr. Figura spoke with Captain Shabenas about the plaintiff's request.  When Captain Shabenas told her that double mattresses were not permitted, Dr. Figura did not order that the plaintiff be provided one. Captain Shabenas states that double mattresses are prohibited for two reasons.  First, the mattresses can shift and separate causing the inmate to slip off the bunk.  Second, the double mattress provides a better hiding place for contraband.  Shabenas Aff., Defs.' Mem. Ex. G, ECF No. 41-7, ¶¶ 6-11, 13.

Dr. Figura did not order a double mattress or any other medical mattress for the plaintiff.  Absent a medical order for a double mattress, Captain Shabenas was not deliberately indifferent to the plaintiff's medical needs for failing to provide one. *See Abreu v. Schriro*, No. 1:14-cv-6418-GHW, 2016 WL

3647958, at *3-4 (S.D.N.Y. July 1, 2016) (correctional staff not deliberately indifferent to prisoner's serious medical needs for denying double mattresses where double mattresses not permitted in facility and prisoner had no doctor order to receive one). The defendants' motion for summary judgment is granted as to that portion of the claim against Captain Shabenas in count 14 of the complaint dealing with the double mattress.

### 2. CTU Transport

The CTU transports all inmates among correctional facilities throughout the State. This includes transporting inmates for medical appointments. Most of these appointments are at the University of Connecticut Health Center in Farmington, Connecticut. Corrigan is located in southeastern Connecticut, which is well over an hour's drive from Farmington. It houses about 1500 inmates. The distance between Corrigan and the Health Center made it difficult for CTU to transport inmates from Corrigan to the Health Center and back the same day. As a result, the Department of Correction arranged for inmates from Corrigan and other facilities in southeastern Connecticut to be transported to New Haven Correctional Center and from there to the Health Center. New Haven Correctional Center is a high volume facility and CTU makes numerous stops there each day. Upon conclusion of their appointments, the inmates are returned to New Haven Correctional Center where they remain until they can be transported back to their facilities.

The plaintiff does not provide evidence showing that Commissioner Semple was aware of his particular situation. Rather, he contends only that Commissioner Semple is responsible for the creation and implementation of all correctional policies and practices. Inmates have no right to be housed in the least restrictive setting. *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983) (inmate has no right to be confined in any particular correctional facility); *Remillard v. Maldonado*, No. 3:13-cv-1714(SRU), 2016

WL 3093358, at *3 (D. Conn. June 1, 2016) (inmate preference for a difference facility does not state Eighth Amendment claim). As the plaintiff has no constitutional right to be housed in any particular facility, the fact that he was housed in a facility without direct transport for non-emergency medical appointments fails to state a cognizable claim against Commissioner Semple. The defendants' motion for summary judgment is granted as to the claims against Commissioner Semple, which are contained in counts 12 and 13 of the complaint.

Warden Santiago states in his affidavit that inmates are transported to medical appointments by CTU unless they meet certain criteria. For example, a seriously mentally ill inmate or an inmate with certain behavioral problems would be taken to medical appointments by facility transport. In addition, the medical department may determine that facility transport is medically necessary. *See* Santiago Aff., Defs.' Mem. Ex. F, ECF No. 41-6, ¶¶ 28, 30.

Warden Santiago states that the plaintiff did not meet the criteria for an exception to CTU transport and the medical department did not order that he be directly transported to the Health Center. Thus, he denied the plaintiff's request. In response, the plaintiff states that he informed Warden Santiago of his inability to pack and carry his property for transport. Although he points to the notations Dr. Figura made regarding her view on CTU transport, he provides no evidence that the Utilization Review Committee approved direct facility transport for him. He does not even identify any order from Dr. Figura that he be directly transported to the Health Center. The record indicates that Warden Santiago complied with the established practice.

Warden Santiago further states that, upon learning that the plaintiff was physically unable to pack and carry his property, he instructed staff to have an inmate assist the plaintiff. *Id.*, ¶ 34-36. Although the plaintiff alleges that Captain Shabenas prevented this instruction from being followed, the

plaintiff does not present any evidence showing that Warden Santiago was aware of Captain Shabenas' actions. The plaintiff has not presented evidence showing that he fit within the exceptions for direct transport or that the medical unit issued any order that he be directly transported to the Health Center. Warden Santiago is not a doctor. Thus, he is entitled to rely on the orders, or lack thereof, from the medical staff. *See Siminausky v. Sean*, No. 3:14-cv-243(VLB), 2017 WL 391425, at *4 (Jan. 25, 2017) (prison administrators entitled to defer to opinions of medical providers). The plaintiff fails to demonstrate that Warden Santiago violated his Eighth Amendment rights. The defendants' motion for summary judgment is granted as to the claims against Warden Santiago which are in counts 16-19 of the complaint.

Finally, the plaintiff contends that Captain Shabenas violated his rights by refusing to permit anyone to assist the plaintiff in packing and carrying his property. Although Captain Shabenas has submitted an affidavit, he does not address this claim. The record evidence shows that Warden Santaigo ordered that the plaintiff be provided assistance in packing and carrying his property. The plaintiff states that defendant Shabenas refused to permit anyone, staff or inmate, to assist him and required the plaintiff to pack and carry his own property. The Court concludes that there is an issue of fact whether Captain Shabenas subjected the plaintiff to unconstitutional conditions of confinement by this refusal. Accordingly, the defendants' motion is denied as to that portion of the claim against Captain Shabenas in count 14 of the complaint relating to the CTU transport.

D.     Administrative Remedies

The plaintiff contends that defendant Augusto violated his Eighth Amendment rights by ignoring, failing to investigate, failing to respond to, or denying his health services reviews. He also

contends that she improperly denied his requests for transfer to another facility.  The defendants contend that these allegations fail to state a cognizable claim.

A health services review is the procedure by which an inmate can seek review of health care diagnoses, practices, or treatment.  The procedure is set forth in Department of Correction Administrative Directive 8.9, entitled Administrative Remedy for Health Care.  *See* Defs.' Mem. Ex. H. Inmates have no constitutionally protected rights to have their grievances investigated or to have grievance procedures followed.  *See Cabassa v. Ostheimer,* 162 F. Supp. 3d 60, 63 (D. Conn. 2016); *see also Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988) ("There is no legitimate claim of entitlement to a grievance procedure."); *Hayes v. County of Sullivan*, 853 F. Supp. 2d 400, 434 (S.D.N.Y. 2012) (plaintiff did not have cognizable section 1983 claim against defendant for not adequately addressing grievance); *Swift v. Tweddell*, 582 F. Supp. 2d 437, 445-46 (W.D.N.Y. 2008) ("It is well-established … that inmate grievances procedures are undertaken voluntarily by the states, that they are not constitutionally required, and accordingly that a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim." (collecting cases)).

The plaintiff argues that health services reviews are not administrative remedies.  The Court disagrees.  The rules governing health services reviews are included in a directive specifically entitled Administrative Remedy for Health Care.  As plaintiff has no constitutionally protected right to effective grievance procedures or to have state procedures followed, the defendants' motion for summary judgment is granted as to the claims against defendant Augusto which are contained in counts 10, 11 and 15 of the complaint.

E.    Qualified Immunity

The defendants argue that they are protected by qualified immunity against all claims for

damages against them in their individual capacities. The only remaining claims are against Dr. Figura regarding her failure to seek direct transport for the plaintiff and against Captain Shabenas for his failure to provide assistance for the plaintiff in carrying and packing his property as ordered by Warden Santiago.

The defendants bear the burden of proving they are entitled to qualified immunity. *See Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013). Qualified immunity attaches when an official's conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna,* 577 U.S ___, ___, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Although the Supreme Court's case law "'do[es] not require a case directly on point'" before a right is considered to be clearly established, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* at ——, 136 S. Ct., at 308 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *see also Taylor v. Barkes*, ___ U.S. ___, ___, 135 S. Ct. 2042, 2044 (2015) ("To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right."). Qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at ___, 136 S. Ct. at 308 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The Supreme Court has cautioned the lower courts many times that "'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, ___ U.S. ___, ___, 137 S. Ct. 548, 551 (2017) (quoting *al-Kidd*, 563 U.S. at 742). Rather, clearly established law "must be 'particularized' to the facts of the case." *Id.* at ___, 137 S. Ct. at 551 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). For example, in *White*, the Court noted that recognition that the case "presents a unique set of

facts and circumstances" should have put the court of appeals on notice that the officer's conduct did not violate a clearly established right.  *Id.* at ___, 137 S. Ct. at 552.

The defendants contend that they acted reasonably and professionally and took no actions with intent to harm the plaintiff.  They argue that a reasonable correctional official or medical professional in their positions would believe their actions were reasonable.

The claim against Captain Shabenas is that he refused the plaintiff assistance from anyone, inmate or staff, in packing and carrying his property despite Warden Santiago's direction that assistance be arranged.  The Court cannot discern how any correctional official would consider disregarding the direction of a supervisory official to be reasonable.

The facts show that Dr. Figura considered the plaintiff to have a serious medical need.  She obtained approval from the Utilization Review Committee for repeated MRI's and a nerve conduction study. Her medical note indicates that she was aware of the plaintiff's reason for not accepting CTU transport and agreed with his reason, stating that the conditions of the CTU transport were contraindicated by his medical condition.  She also indicated that she would seek approval for direct transport.  However, the record contains no evidence that she did so and Dr. Figura does not address this claim in her affidavit.  Based on the record evidence, the Court cannot agree that a reasonable medical professional would consider it reasonable to fail to make any effort to ensure that the plaintiff could obtain the tests the professional regarded as medically necessary.

The defendants' motion for summary judgment is denied as to the claim that they are protected by qualified immunity.

F.    Declaratory and Injunctive Relief

The plaintiff seeks declaratory and injunctive relief.  He acknowledges that he has been

transferred to MacDougall-Walker Correctional Institution and states that he wants to pursue his request for declaratory relief for other inmates and in case he returns to Corrigan.

Declaratory relief serves to "settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of that right or a disturbance of the relationship." *Colabella v. American Institute of Certified Public Accountants*, No. 10-cv-2291(KAM/ALC), 2011 WL 4532132, at *22 (E.D.N.Y. Sept. 28, 2011) (citations omitted). Declaratory relief operates prospectively to enable parties to adjudicate claims before either side suffers great damages. *See In re Combustible Equip. Assoc.*, 838 F.2d 3, 37 (2d Cir. 1988). The complaint concerns only past actions. The plaintiff has not identified any legal relationships or issues that require resolution via declaratory relief. *See Camofi Master LDC v. College P'ship, Inc.*, 452 F. Supp. 2d 462, 480 (S.D.N.Y. 2006) (concluding that claim for declaratory relief that is duplicative of adjudicative claim underlying action serves no purpose). If the plaintiff were to prevail on his substantive claims, the Court necessarily would determine that the defendants had violated the plaintiff's constitutional rights. Thus, a separate award of declaratory relief is unnecessary.

The plaintiff states that he intends to pursue the request for injunctive relief only as it pertains to obtaining a medical mattress and examination by a specialist with his instructions followed. The plaintiff concedes that the remainder of his request for injunctive relief is now moot. The Court notes that in his complaint, the plaintiff lists three requests for injunctive relief: (1) transfer to any other prison, (2) a medical mattress, and (3) an order that he be free from retaliation. The plaintiff cannot amend his request for relief in his memorandum in opposition to the motion for summary judgment. *See Wright v. Ernst & Young, LLP*, 152 F.3d 169, 178 (2d Cir. 1998). Thus, any request for examination by a specialist is not included in this action.

"'[I]njunctive relief against a state official may be recovered only in an official capacity suit …

because '[a] victory in a personal-capacity action is a victory against the individual defendant, rather

than against the entity that employs him.'" *Marsh v. Kirschner*, 31 F. Supp. 2d 79, 80 (D. Conn. 1998)

(quoting *Hill v. Shelander*, 924 F.2d 1370, 1374 (7th Cir. 1999) and *Kentucky v. Graham*, 473 U.S. 159,

167-68 (1985)). The plaintiff named only Warden Santiago and Commissioner Semple in their official

capacities. Thus, injunctive relief is available only against these two defendants.

The Court has concluded above that the plaintiff failed to state any cognizable claims against

Commissioner Semple of Warden Santiago and has granted the defendants motion for summary

judgment as to all claims against them. As there are no defendants from whom injunctive relief may be

received, the request for injunctive relief is dismissed.

G.      State Law Claims

Finally, the plaintiff states in his complaint that he seeks supplemental jurisdiction over state law

claim. However, he identifies no state law claims or causes of action in his complaint. The Court

concludes that the plaintiff asserts only federal law claims in this action.

IV.     Conclusion

Defendants' motion for summary judgment [ECF No. 41] is GRANTED in part and DENIED in

part. The motion is granted as to all claims against defendants Farinella, Ruiz, Semple, Augusto, and

Santiago, all claims except the Eighth Amendment claim against defendant Figura for deliberate

indifference to a serious medical need by failing to seek direct transport, and all claims except the Eighth

Amendment claim against defendant Sabenas for denying assistance. The case will proceed to trial

against defendants Figura and Sabenas on these two claims.

**SO ORDERED.**

Signed this 18th day of October 2017 at Hartford, Connecticut.

_____/s/_____
Michael P. Shea
United States District Judge